### In re SARAMAR ALUMINUM COMPANY, Debtor.

### SARAMAR ALUMINUM COMPANY, Plaintiff,

### v.

### HORIZON SKYLIGHT SYSTEMS, INC., Defendant.

### Bankruptcy No. B85–00860–Y. Adv. No. 87–0028.

United States Bankruptcy Court, N.D. Ohio.

Feb. 7, 1989.

---

Michael A. Gallo, Youngstown, Ohio, for debtor/plaintiff.

Richard G. Zellers, Youngstown, Ohio, for defendant.

Conrad J. Morgenstern, Cleveland, Ohio, U.S. Trustee.

## ORDER

WILLIAM T. BODOH, Bankruptcy Judge.

This cause is before the Court on the adversary complaint filed by the Debtor against HORIZON SKYLIGHT SYSTEMS, INC., ("HORIZON").

The Debtor was formerly involved in the manufacture and supply of aluminum extrusions to various customers. On September 19, 1985, Debtor filed a petition for reorganization under Chapter 11 of Title 11, United States Code. Pursuant to a pre-petition agreement between Debtor and a manufacturer's representative organization, GARY GALUCCI, an employee of the organization, acted as a sales agent and solicited purchase orders for the Debtor. As a result of sales contacts by Mr. Galucci, HORIZON placed several orders with the Debtor for custom-made extrusions needed in its manufacture of skylights. On or about May 31, 1986, the Debtor shipped to HORIZON what was believed to be a standard order of extrusions in shapes used exclusively by HORIZON. Subsequent shipments were made on June 17,

1986, and July 13, 1986. The Debtor shipped an aggregate of approximately 18,-500 pounds of extrusions to HORIZON in these three deliveries at a unit price of One & 37/100 Dollars ($1.37) per pound.

After delivery and inspection of the extrusions, HORIZON determined the extrusions were not their shapes and were unsuitable for its purposes. Initially, it appears that Mr. Galucci was notified of the nonconformity and assured HORIZON that Debtor would pick up the incorrect shipment. Debtor did not pick up the nonconforming shapes, and HORIZON unsuccessfully attempted to notify the Debtor directly concerning return of the materials. On June 24, 1986, HORIZON transmitted a letter to the Debtor at its correct business address in which it requested retrieval of the incorrect extrusions and shipment of the correct ones. On July 22, 1986, HORIZON sent another letter to the Debtor which again requested retrieval of the incorrect extrusions and shipment of the correct ones. The Debtor ceased operations on July 31, 1986. Finally, on August 12, 1986, HORIZON notified the Debtor in writing of its intent to both scrap the incorrect extrusions and to cover by obtaining proper extrusions elsewhere. There was no response to any of these letters.

HORIZON contacted EASCO ALUMINUM ("EASCO"), which agreed to manufacture conforming extrusions. However, EASCO's quoted price was higher than the price Debtor was charging HORIZON. HORIZON obtained a quote of eighteen cents per pound for scrapping the incorrect extrusions from AMERICAN SCRAP METAL AND PAPER COMPANY ("AMERICAN SCRAP"). However, it appears that AMERICAN SCRAP refused to pick up the material unless HORIZON cut and barreled the extrusions. HORIZON determined that it would not be economically feasible to accept AMERICAN SCRAP's offer. Therefore, A. CAPONE SANITATION, INC., ("CAPONE") was contacted, and they hauled away the extrusions.

On May 6, 1987, the Debtor filed the instant complaint. On February 10, 1988, HORIZON filed its Answer and Counter-

claim. A hearing on the matter was held on January 23, 1989.

■ The Court is convinced that the Debtor delivered nonconforming extrusions to HORIZON. STANLEY SLOSBERG testified that he personally examined the delivered goods and determined that the wrong extrusions had been shipped to them. The only contrary evidence was the testimony of ROBERT ITTS, President of the Debtor, that finished goods were routinely inspected. Mr. Itts admitted his lack of personal knowledge concerning either shipment or inspection of the materials at issue in this proceeding.

The next question is whether the rejection by HORIZON complied with the Uniform Commercial Code, as adopted in the Ohio Revised Code. A rightful rejection under Ohio Rev.Code Sec. 1302.61 requires that:

(1) rejection occurs within a reasonable time after delivery, and the buyer seasonably notifies the seller of the rejection;

(2) the buyer does not exercise ownership; and

(3) if the buyer has no security interest, the goods must be held with reasonable care for a time sufficient to permit the seller to remove them.

In this case, it appears that HORIZON rejected the goods shortly after delivery by notifying Mr. Galucci by telephone. He subsequently inspected the goods personally. While notice to the Debtor's agent ought to be sufficient, HORIZON also notified the Debtor by letter. In light of Mr. Slosberg's testimony regarding transmittal of the correspondence and Mr. Itts' testimony regarding nonreceipt, the Court concludes that the letters may have been either misplaced or forgotten while the Debtor was winding down its business operations. In any event, the Court finds notice of rejection was seasonable. Moreover, there is no evidence in the record to suggest that HORIZON improperly exercised ownership over the goods. There is also evidence that HORIZON held the goods for a reasonable time after rejection. As a result, the Court finds HORIZON exercised

its right of rejection in an appropriate manner. Accordingly, HORIZON is not liable to the Debtor for the sale price of the goods.

■ In its Answer, HORIZON asserts a counterclaim against the Debtor. The first basis for its counterclaim asserts damages resulting from payment of a higher price for procurement of substitute goods. Ohio Revised Code Sec. 1302.86 allows a buyer to "cover" and purchase substitute goods upon a seller's breach. Damages may be recovered equal to "the difference between the cost of cover and the contract price, together with any incidental or consequential damages...." Ohio Rev.Code Sec. 1302.86(B). The difference between the cover price and the contract price was obscure because the Debtor sold its extrusions according to pounds, while EASCO based its price on feet. As a result, the Court was presented with two differentials, both of which were represented to be the difference between the cover and contract price. HORIZON argued the differential was fifteen cents, while the Debtor contended the real difference was only nine cents. Neither party stated specifically how the figures were calculated. Mr. Itts indicated that he had personally calculated the differential. Although Mr. Slosberg testified that he did not calculate the fifteen-cent figure, he failed to indicate who had calculated the difference. Because Mr. Itts was available for cross-examination on his calculations, the Court will accept his nine-cent figure. Thus, the difference between the cover and contract price was One Thousand, Six Hundred Sixty–Five & 00/100 Dollars ($1,665.00).

■ HORIZON also asserts damages in the amount of Eighteen Thousand & 00/100 Dollars ($18,000.00) for replacement of the dies. It appears that this would be an appropriate claim insofar as it represents a cost which HORIZON sustained in order to obtain cover. However, HORIZON offered no direct evidence that it had *actually paid* for the die replacement. The testimony indicated that HORIZON was charged a premium on each foot of extrusion ordered for the cost of manufac-turing the dies. It is not at all clear that HORIZON ordered enough extrusions to result in an expenditure of Eighteen Thousand & 00/100 Dollars ($18,000.00) before the business was sold in February, 1987. Furthermore, the Court is inclined to credit the testimony of Mr. Itts, who stated that industry practice is that aluminum extruding customers are "entitled to exclusive use of the dies, but not possession of them." Thus, HORIZON had no right to return of the dies. The Defendant failed to sustain its burden of proof on this count of its Counterclaim.

■ Finally, HORIZON claims that the Debtor should be liable for an expenditure of Two Hundred Eighty–Two & 75/100 Dollars ($282.75) which HORIZON paid to CAPONE to carry away the incorrect extrusions. It appears that this is an appropriate claim. However, the Debtor suggested during trial that the incorrect extrusions should have been salvaged for a significantly higher price than that which was offered. If the Debtor's contention was correct, it would have both made the hauling fee unnecessary and partially reimbursed the Debtor for its work and materials. For the Debtor, Mr. Itts testified that the consistent correlation of price between extrusion, billet and scrap led him to estimate the proper salvage value to be forty-seven cents per pound based on an extrusion value of One & 37/100 Dollars ($1.37) per pound. Mr. Itts' testimony was persuasive, but it fails to explain why AMERICAN SCRAP was only willing to offer eighteen cents per pound. Under Ohio Rev.Code Sec. 1302.62(C), a buyer is held only to good-faith conduct in its salvage efforts. The Court is convinced that HORIZON acted reasonably and in good faith in an attempt to salvage the incorrect extrusions. We view their salvage efforts to be sufficient in the absence of reasonable instructions from the Debtor regarding disposition of the extrusions.

As a result, the Court hereby dismisses the Debtor's Complaint. Regarding HORIZON's Counterclaim, the Court hereby grants relief in part and denies relief in part. The Court sustains HORIZON's

Counterclaim for One Thousand, Nine Hundred Forty–Seven & 75/100 Dollars ($1,947.75) representing its costs for cover and hauling away of the incorrect extrusions. HORIZON's Counterclaim is denied in its claim for Eighteen Thousand & 00/100 Dollars ($18,000.00) for the manufacture of new dies. HORIZON is granted leave to file a Proof of Claim in the above-allowed amount to the close of business the thirtieth day following entry of this Order.

IT IS SO ORDERED.